UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| Gregory Gerald Bouknight, ) | |
| ) | C/A No.: 4:14-cv-3027-TER |
| Plaintiff, ) | |
| ) | |
| v. ) | ORDER |
| ) | |
| CAROLYN W. COLVIN, ACTING ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for supplemental security income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether the proper legal standards were applied. For the reasons that follow, the court affirms the Commissioner's decision.[1]

## I.  RELEVANT BACKGROUND

### A.     **Procedural History**

On March 2, 2011, the Plaintiff filed an application for SSI alleging disability since December 8, 2010.[2] The claim was denied initially and upon reconsideration. A video hearing was held by an Administrative Law Judge ("ALJ") on March 12, 2013. The ALJ found in a decision

---

[1]This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civil Rule 73.01(B) (D.S.C.), and the Honorable Mary G. Lewis' January 14, 2015, order referring this matter for disposition. Entry # 15. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals.

[2]Plaintiff later amended his alleged disability onset date to August 1, 2010. (Tr. 150).

1

dated June 5, 2013, that Plaintiff was not disabled. The Appeals Council denied Plaintiff's request for review making the ALJ's decision the Commissioner's final decision for purposes of judicial review. Plaintiff filed this action on July 29, 2014, in the United States District Court for the District of South Carolina.

**B.     Plaintiff's Background and Medical History**

   **1.     Introductory Facts**

Plaintiff was born on July 1, 1967 and was 43 years old at the time the application was filed. (Tr. 22). Plaintiff has past relevant work experience as a cashier, janitor, and taxi driver. Plaintiff alleges disability due to heart disease, passing out, and high blood pressure. (Tr. 155).

   **2.     Medical Records and Opinions**

On August 4, 2010, Plaintiff went to Self Regional Healthcare complaining about chest pain, nausea, dizziness, and perspiration. (Tr. 431). His blood pressure was elevated on admission, but decreased to normal levels upon treatment. (Tr. 445). The next day, he underwent a cardiac catheterization, which showed 90% blockage of his right coronary artery. (Tr. 445). A percutaneous stent was placed. (Tr. 445). After the procedure, Plaintiff stayed overnight at the hospital and did well. Id. The hospital discharged him the next day, on August 6, 2010. (Tr. 444). On discharge, his attending physician placed him on medication and recommended that he adhere to a diet with low fat, cholesterol, and salt and follow-up with his primary care physician. (Tr. 445).

A few weeks later, Plaintiff had a follow-up appointment with Piedmont Cardiology Associates. APRN Angela Mearns noted that Plaintiff was "doing well from cardiac standpoint." (Tr. 788-789).

Several months later, in December 2010, Plaintiff returned to Self Regional Healthcare for follow-up testing. (Tr. 535, 778). That testing showed that Plaintiff had "mild concentric left ventricular hypertrophy," or enlargement of the muscle tissue, with an overall left ejection fraction

estimated at 60-65%. (Tr. 778). Other than noting that mild finding, the testing was unremarkable: the left ventricle was normal in size, the systolic function was normal, and no segmental wall motion abnormalities were seen. Id. All other cardiac chambers were normal in size and function, including his right atrium and right ventricle. Id. There were no significant valvular abnormalities or pericardial effusion. Id.

In January 2011, Plaintiff visited Dr. Paul Kim with Piedmont Cardiology Associates to follow up on his coronary artery condition. (Tr. 598). Dr. Kim observed that nuclear images from stress testing at the hospital were "essentially normal" and the previously noted anteroseptal segment abnormalities were no longer present. Id.  Dr. Kim indicated that the December 2010 echocardiogram testing revealed normal left ventricular systolic function, with an ejection fraction of 60-65%, no pericardial effusion, and systolic pulmonary artery pressures within normal limits. Id. He did confirm concentric left ventricular hypertrophy. Plaintiff was noted to have no orthopnea, nocturnal dyspnea, or edema formation. Id. On physical examination, Plaintiff's cardiovascular system was normal. (Tr. 599). Overall, Dr. Kim observed that Plaintiff was "[d]oing well from [a] cardiac standpoint." Id.  He indicated that Plaintiff's symptoms were more consistent with a neurologic issue such as absence seizures rather than any cardiac cause for syncope. Id.

In February 2011, Plaintiff went to the hospital complaining about fainting. (Tr. 667). Plaintiff reported six similar episodes since July 2010. (Tr. 554). An x-ray of Plaintiff's chest, however, showed that his chest was stable, without active infiltrations or failure. (Tr. 656). His heart was not enlarged, there were no effusions, and his lungs were clear. Id. There were no abnormalities in his chest and he denied experiencing shortness of breath or chest pain. (Tr. 668).

The following month, in March, Plaintiff went to his primary care physician, Dr. William Sawyer, for a check-up. (Tr. 596). Plaintiff reported to Dr. Sawyer that he had not had any additional

3

fainting episodes. Id. Dr. Sawyer reviewed Plaintiff's hospital records, and the report from a Holter monitor that Plaintiff had worn. (Tr. 563-564), which he noted to be "basically benign." Id. Following an examination, Dr. Sawyer observed that Plaintiff's heart sounds were normal and his lungs were clear. Id. According to Dr. Sawyer, Plaintiff's coronary artery disease was stable, he had no further fainting episodes, and he should continue taking his medication for hypertension. Id.

On March 31, 2011, Plaintiff went to emergency room with a syncope episode. (Tr. 676-677, 680-681). A Chest x-ray noted the lungs were clear and the heart was not enlarged, with a notation of a stable appearance of the chest. (Tr. 696).

In early May 2011, Plaintiff visited Dr. Sawyer's office. Nurse practitioner John Wates assessed Plaintiff with pneumonia. (Tr. 710). Plaintiff returned ten days later for a recheck. During the visit, Plaintiff reported that he was "doing well." Id. He stated that he experienced no chest pain and no shortness of breath. Id.

In July 2011, Dr. David Holt performed a consultative examination of Plaintiff. (Tr. 711-17). Plaintiff reported to Dr. Holt that he could stand for half an hour before having to take a break for about 10 to 15 minutes. (Tr. 713). He also explained that he could sit for half an hour, but was unable to tell Dr. Holt why he could not sit longer. Id. He estimated that he could lift 20 to 25 pounds with his left arm. Id.

On examination, Dr. Holt observed that Plaintiff was in no acute distress. Id. He had no difficulty getting out of his chair, undressing and dressing himself, or getting on and off the examining table. Id. He did not use an assistive device to walk. Id. His lungs were clear, his heart had a regular sinus rhythm with normal sounds, and his extremities were normal (other than his right

arm paralysis).³ (Tr. 714). He had full grip strength in his left extremities, normal gross and fine manipulation on the left, and elbow flexion and supination was normal bilaterally. Id. He tandem walked at 5/5 and squatted and heel and toe walked at 4/5 (because of some low back pain). (Tr. 714). His back, though, exhibited normal posture with only minimal tenderness. (Tr. 714). His motor exam was normal. (Tr. 715).

On September 1, 2011, Dr. Carl Anderson completed a physical residual functional capacity assessment in which he opined that Plaintiff was capable of performing medium work. (Tr. 718-725).

In late September, Plaintiff reported to Dr. Sawyer that he had not been taking his medication as prescribed. (Tr. 784). However, despite his noncompliance, his blood pressure was only slightly elevated at 130/80 and he had a normal heart rate of 69. (Tr. 784). As before, Dr. Sawyer observed that Plaintiff's heart sounds were normal and his lungs were clear. (Tr. 784). He had normal pulses in his extremities and no swelling in his legs. (Tr. 784). He was noted to have no further syncope epsides since his last appointment. Id.

Plaintiff returned to Dr. Sawyer in October of 2011 and reported feeling "all right," except for one episode where he was outside and got hot, and had symptoms of dizziness, perspiration and a "hot feeling." Again, Plaintiff's heart sounds were noted to be normal, and his lungs were clear. Dr. Sawyer indicated that he "feel[s] Plaintiff is totally and permanently disabled due to his heart condition, his education level, his right arm paralysis." (Tr. 784).

In January 2012, Plaintiff reported to Piedmont Cardiology Associates for a blood pressure check. Notes from APRN Mearn indicated that Plaintiff reported no headaches, no blurred or double vision, no chest pain, no orthopnea, no PND or edema formation. Plaintiff had been compliant with

---

³Plaintiff testified that his right arm paralysis was due to a football accident in 1984, and that he has had no use of his right arm since that time. (Tr. 51).

5

his medications since his last office visit, and his blood pressure was noted to be greatly improved with his new medications. (Tr. 799).

On January 23, 2012, Dr. Sawyer also completed an impairment questionnaire in connection with Plaintiff's application for SSI.[4] (Tr. 803-805). Dr. Sawyer opined that Plaintiff could sit and stand/walk for about 2 hours in an 8-hour day. Id. Dr. Sawyer opined that Plaintiff could never lift twenty pounds, rarely lift ten pounds and occasionally lift less than ten pounds. (Tr. 801). He further indicated that Plaintiff would be absent from work more than four days per month as a result of the combined effects and treatment of his coronary artery disease, syncope, right arm paralysis and high blood pressure. Dr. Sawyer indicated that Plaintiff was disabled and unable to work. (Tr. 804). Examination notes from this date continue to note normal heart sounds, and clear lungs. Plaintiff's hypertension is deemed to be "acceptable for now." (Tr. 809).

On the same date, Dr. Kim completed an impairment questionnaire in connection with Plaintiff's application for SSI. (Tr. 800-802). Dr. Kim opined that Plaintiff could sit for about 2 hours and stand/walk for less than two hours in an 8-hour day. (Tr. 800- 803). Dr. Kim opined that Plaintiff could never lift twenty pounds, rarely lift ten pounds and occasionally lift less than ten pounds. (Tr. 801). He further indicated that Plaintiff would be absent from work more than four days per month as a result of the combined effects and treatment of his coronary artery disease, syncope, right arm paralysis and high blood pressure. Dr. Kim indicated that Plaintiff was disabled and unable to work. (Tr. 801).

On September 25, 2015, Plaintiff saw NP Wates with complaints of chest pain. (Tr. 810).

---

[4]Physician Reports were completed by Dr. Sawyer (in October of 2011, April of 2012, and October of 2012) and FNP Mearns (from Dr. Kim's practice)(in December of 2011) for the Department of Social Services. The reports reflect the opinions of Dr. Sawyer and FNP Mearns that "Patient is permanently and totally disabled" (Tr. at 787, 806-807, and 812-814).

It was noted that he was off of all of his anticoagulants. His EKG was noted to "look normal at this time," but he was referred to the ER. Plaintiff was admitted to the hospital on that day. Diagnostic testing, though, was unremarkable: he had normal sinus rhythm, with a heart rate of 69 beats per minute, normal wall motion and thickening, normal myocardial perfusion, a normal dual SPECT imaging study, normal left ventricular ejection fraction, and normal left ventricle size (Tr. 824-25). In a follow-up visit with Dr. Sawyer on October 8, 2012, it was noted that Plaintiff had been admitted to the hospital and a Cardiolite stress test was done, with normal results. It was noted that Plaintiff had not filled his medications, with an annotation that Plaintiff indicated that he did not have any money and was unable to get the medicines. (Tr. 811).

Plaintiff was again admitted to the hospital in October of 2012. (Tr. 815). A left heart catheterization was performed. The procedure summary noted that Plaintiff had normal left ventricular systolic function with ejection fraction of 55 percent and normal left ventricular filling pressures (Tr. 818). It was also noted that successful angioplasty and stent deployment was accomplished as to two arteries. Id.

**C.     The ALJ's Decision**

In the decision of June 5, 2013, the ALJ found the following:

1.  The claimant has not engaged in substantial gainful activity since March 2, 2011, the application date (20 CFR 416.971 *et seq*.).

2.  The claimant has the following severe impairments: coronary artery disease, high blood pressure, right arm paralysis, and obesity (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.920(d), 404.925, and 404.926).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.967(b). In particular, the claimant is able to lift up to 20

7

> pounds occasionally, and lift or carry up to 10 pounds frequently. He is able to stand or walk for about 6 hours in an 8-hour workday, and sit for up to 6 hours in an 8-hour workday with normal breaks. In addition, the claimant is able to frequently balance, stoop, kneel, and crouch. The claimant can occasionally crawl, and climb ramps and stairs; however, he must never climb ladders, ropes, or scaffolds. Furthermore, the claimant can never reach overhead, or perform fine and gross manipulation with his right arm. Additionally, he must avoid concentrated exposure to extreme cold, heat, humidity, and concentrated exposure to hazardous machinery and unprotected heights. Finally, the claimant must avoid job duties involving driving or operating motor vehicles.

5. The claimant is unable to perform any past relevant work. (20 CFR 404.1565 and 416.965).

6. The claimant was born on July 1, 1967 and was 43 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.969 and 404.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since March 2, 2011, the date the application was filed  (20 CFR 404.920(g)).

(Tr. 12-24).

## II. DISCUSSION

The Plaintiff argues that the ALJ erred in his decision. Specifically, Plaintiff raises the following argument in his brief, quoted verbatim:

1. DID THE ALJ FAIL TO GIVE THE APPROPRIATE CONTROLLING WEIGHT TO THE OPINIONS OF THE PLAINTIFF'S TREATING PHYSICIANS AND THEREBY FAIL TO FIND THE CLAIMANT WAS DISABLED BECAUSE HIS RESIDUAL FUNCTIONAL

8

CAPACITY WAS LESS THAN SEDENTARY?

(Plaintiff's brief).

The Commissioner argues that the ALJ's decision was based on substantial evidence and that substantial evidence supports the ALJ's evaluation of the medical opinions of record.

**A.        LEGAL FRAMEWORK**

**1.        The Commissioner's Determination–of–Disability Process**

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as: the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months. 42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. See, e.g., Heckler v. Campbell, 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[5] (4) whether such impairment prevents claimant from

---

[5]The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant

performing PRW;[6] and (5) whether the impairment prevents him from doing SGA. See 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. See 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d) (5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir.2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. Hall v. Harris, 658 F.2d 260, 264–65 (4th Cir.1981); see generally Bowen v. Yuckert,

---

must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990); see Bowen v. Yuckert, 482 U.S. 137, 146, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[6]In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (regarding burdens of proof).

### 2.   The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [ ] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. See id.; Richardson v. Perales, 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); Walls, 296 F.3d at 290 (citing Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." Vitek v. Finch, 438 F.2d 1157, 1157–58 (4th Cir.1971); see Pyles v. Bowen, 849 F.2d 846, 848 (4th Cir.1988) (citing Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 390, 401; Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir.2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. See Vitek, 438 F.2d at 1157–58; see also Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir.1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir.1972).

### B.   ANALYSIS

The Social Security Administration's regulations provide that"[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). Generally, more weight

11

is given to the opinions of examining physicians than nonexamining physicians. More weight is given to the opinions of treating physicians since they are more likely to be able to provide a detailed, longitudinal picture of a claimant's medical impairment. See 20 C.F.R. §§ 404.1508 and § 404.1527(c)(2). The medical opinion of a treating physician is entitled to controlling weight, i.e. it must be adopted by the ALJ, if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See 20 C.F.R. § 404.1527(c)(2), SSR 96-2p, and Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2 31, 35 (4th Cir. 1992)).

In determining what weight to give the opinions of medical sources, the ALJ must apply all of the factors in 20 C.F.R. § 404.1527(c)(1)-(6), which are: whether the source examined the claimant; whether the source has a treatment relationship with the claimant and, if so, the length of the relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability and consistency of the source's opinion with respect to all of the evidence of record; whether the source is a specialist; and, other relevant factors. See SSR 96-2p; Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006).

Dr. Sawyer is Plaintiff's primary care physician. Dr. Kim is a treating cardiologist. Both of these physicians have given similar opinions containing the functional limitations outlined above.

The ALJ's discussion and assessment of these opinions reads as follows:

> In October 25, 2011, April 16, 2012, and October 8, 2012 physician reports completed by Dr. Sawyer for the claimant, he opined that the claimant was unable to work and was

permanently and totally disabled due to his impairments. Additionally, on January 16, 2012, and January 23, 2012, Dr. Paul Kim and Dr. William Sawyer respectively completed an impairment questionnaire in regards to the claimant. They opined that the claimant could sit for about two hours, and stand or walk for at least 2 hours in an 8-hour workday. Dr. Kim stated that the claimant could walk less than one block, would miss work more than 4 days per month; and that the claimant was not able to perform normal work activities by sitting or standing 6 hours out of an 8-hour workday. Dr. Sawyer opined the claimant would not be able to work on a regular job on a sustained basis because the claimant still has chest pain with relief from nitroglycerin, and because his high blood pressure fluctuates.

The undersigned finds the medical opinions of Dr. Sawyer and Dr. Kim significantly contradicted by the totality of the above discussed medical treatment evidence. Consequently, they are accorded only partial weight. Key specified medical tests and exam findings undermine these opinions. They include but are not limited to, the lack of exam findings or test results that indicate the claimant would be unable to sustain a full work day or week. In particular, these opinions are inconsistent with the claimant's reports that he has no chest pain, no shortness of breath, no abdominal pain, no nausea, and no vomiting. Additionally, the claimant's follow-up blood pressure reading was minimally elevated at 130/80, and his EKG showed an SR rate of 69. Similarly, the claimant's recent diagnostic catherization revealed a normal left ventricular systolic function with ejection fraction of 55 percent and normal left ventricular filling pressures with L VEDP of 6mm Hg. Furthermore, the claimant's most recent stress test showed normal sinus rhythm with a heart rate of 69 beats per minute; and during infusion, the ECG showed no significant change and his left ventricle was of normal size. These findings starkly refute the opinions proffered by Dr. Sawyer and Dr. Kim.

(Tr. 19)(Exhibit cites omitted)

The ALJ considered Dr. Sawyer and Dr. Kim's opinions, but assigned them only partial weight because they were inconsistent with other evidence in the record. Despite the disabling limitations Drs. Sawyer and Kim assigned Plaintiff, the ALJ notes that the doctors' opinions are undermined both by key medical tests and exam findings. This determination is supported by substantial evidence.

In January 2011, several months after Plaintiff's catheterization procedure, Dr. Kim examined Plaintiff and noted normal findings in connection with Plaintiff's cardiovascular system. (Tr. 599). Dr. Kim indicated that Plaintiff was "[d]oing well from [a] cardiac standpoint." Id. Dr. Sawyer's treatment notes also confirmed that Plaintiff's condition was controlled. After examining

Plaintiff in March 2011, Dr. Sawyer observed that Plaintiff's heart sounds were normal and his lungs were clear. (Tr. 596). Dr. Sawyer indicated that Plaintiff's coronary artery disease was "stable." Id. In a May visit to Dr. Sawyer's office, Plaintiff reported that he was "doing well" and stated that he had no chest pain and no shortness of breath, abdominal pain, nausea, or vomiting. (Tr. 710). In September 2011, Plaintiff's blood pressure was only slightly elevated (even though he was not taking his medication) and his heart rate was normal (Tr. 784). Dr. Sawyer again noted that Plaintiff's heart sounds were normal, his lungs were clear, he had normal pulses in his extremities, and he had no swelling in his legs. Id. The ALJ's finding that the opinions of Dr. Sawyer and Dr. Kim are not supported by their own exam notes is supported by substantial evidence. See, e.g., Craig, 76 F.3d at 590 (affirming ALJ's rejection of treating physician opinion where that physician's own notes contradicted his opinion); Bolton v. Astrue, No. 11-3357, 2013 WL 1010323, at *2-3 (D.S.C. Mar. 14, 2013) (same).

The objective medical evidence also supports the ALJ's assessment and decision to discount these doctors' opinions. In December 2010, several months after his catheterization procedure in August, testing revealed overall normal results, with only a showing of mild concentric left ventricular hypertrophy. (Tr. 778). X-rays from February 2011 also were normal: Plaintiff's chest was stable without active infiltrations or failures; his heart was a normal size; there were no effusions; and his lungs were clear (Tr. 656). In September 2012, diagnostic testing again confirmed that his heart condition was under control: he had normal sinus rhythm, normal wall motion and thickening, normal myocardial perfusion, a normal dual SPECT imaging study, normal left ventricular ejection fraction, and normal left ventricle size (Tr. 824-25). The ALJ's finding that the opinions of Dr. Sawyer and Dr. Kim are not supported by objective medical evidence is supported by substantial evidence. See, e.g., *Craig*, 76 F.3d at 590 (a treating physician's opinion that "is not

14

supported by clinical evidence or . . . is inconsistent with other substantial evidence . . . should be accorded significantly less weight").

Additionally, the Court notes that the doctors' opinions suggest more restrictions than even Plaintiff alleged. (Tr. 22). Both Drs. Sawyer and Kim opined that Plaintiff could never lift 20 pounds, yet Plaintiff told Dr. Holt, the consultative examiner, that he could lift 20 to 25 pounds with his left arm. (Tr. 713). Thus, Plaintiff's own testimony contravenes the doctors' answers in their impairment questionnaires. See Laird v. Comm'r of Soc. Sec., No. 13-1182, 2014 WL 583073, at *2 n.2 (D. Md. Feb. 12, 2014) (finding it noteworthy that physician's opinion was more restrictive than claimant's own testimony).

Finally, the Court notes that to the extent Drs. Sawyer and Kim opined that Plaintiff was "disabled," these opinions are not entitled to any significant weight. (Tr. 801, 804, 807, 813). Opinions about "findings that are dispositive of the case, i.e., that would direct the determination. . . of disability," are explicitly reserved to the Commissioner and are not entitled to any special deference. 20 C.F.R. § 416.927(d)(1), (3); *Thompson*, 442 F. App'x at 808 ("Such opinions are not afforded any special significance."). For all of the above reasons, the Court concludes that substantial evidence supports the ALJ's evaluation of Drs. Sawyer and Kims' opinions.[7]

The Court notes that in determining that Plaintiff could perform light work with additional limitations, the ALJ also considered the opinions by consulting examiner Dr. Holt, and State agency medical consultant Dr. Anderson. The ALJ gave partial weight to the opinions of Dr. Holt (outlined

---

[7]The ALJ also addresses the opinion of FNP Mearns that Plaint was "permanently and totally disabled." The ALJ noted that FNP Mearns is not an acceptable medical source, but considered her as another source whose information may be helpful to the ALJ's review. The ALJ fully considered FNP Mearns conclusions regarding the claimant's functional limitations and found them to be unsupported by medical evidence for the same reasons discussed above in relation to the opinions of Drs. Sawyer and Kim. In light of the discussion above, the Court concludes that substantial evidence supports the ALJ's evaluation of FNP Mearns opinion.

in detail, supra,). The ALJ found Dr. Holt's opinion to be consistent with claimant's examinations showing that his coronary artery disease and high blood pressure had stabilized. The ALJ relied on Dr. Holt's consultative examination, which showed that Plaintiff's lungs were clear; his heart had a regular sinus rhythm with normal sounds; he had full grip strength and normal gross and fine manipulation in his left extremities; normal bilateral elbow flexion and supination; a 5/5 tandem walk; a 4/5 squat and heel and toe walk; normal back posture; and normal motor exam. (Tr. 714-15). As the ALJ explained, these findings supported an RFC for light work. (Tr. 20). In addition, Dr. Anderson, a state agency physician who reviewed Plaintiff's records, found that Plaintiff could perform medium work, which involves even more exertion than the ALJ ultimately found Plaintiff could perform. (Tr. 20, 718-25). The ALJ gave Dr. Anderson's opinion partial weight.

State agency consultants are "highly qualified" medical professionals and "experts in the evaluation of medical issues in disability claims under the Act." 20 C.F.R. § 404.157(e)(2)(I). The opinions of state agency physicians are entitled to consideration under the same regulations used to assess other medical opinions. Id. Where "the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). After careful review and consideration, the Court finds that the ALJ appropriately considered and evaluated all of the opinion evidence of record and his findings, related to these opinions and the determined RFC for light work with additional limitations, are supported by substantial evidence as outlined herein.[8]

---

[8]The Court notes the ALJ expressly accounted for Plaintiff's right arm paralysis by finding in the RFC that Plaintiff "can never reach overhead, or perform fine and gross manipulation in his right arm." (Tr. 15). At the hearing, a vocational expert confirmed that, even with that limitation, there were still a significant number of jobs existing in the national economy that Plaintiff could perform. (Tr. 23, 68-69). See, e.g., Walls v. Barnhart, 296 F.3d 287, 291-92 (4th Cir. 2002) (VE testimony constituted substantial evidence to support step five determination). Moreover, to the extent Plaintiff suggests that his right arm paralysis was work-

### III. CONCLUSION

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence. <u>Richardson</u>, 402 U.S. at 390. Even where the Plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. <u>Blalock</u>, 483 F.2d at 775. The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion. <u>Shively v. Heckler</u>, 739 F.2d at 989. As previously discussed, despite the Plaintiff's claims, he has failed to show that the Commissioner's decision was not based on substantial evidence.

Based upon the foregoing, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

s/Thomas E. Rogers, III<br>
Thomas E. Rogers, III<br>
United States Magistrate Judge

September 30, 2015<br>
Florence, South Carolina

---

preclusive, that notion is undermined by his own admission that he had adapted to becoming left-hand dominant and the fact that he was able to work full time in light and medium exertional jobs since 1995 (Tr. 39-40, 59, 156).